IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | Criminal No. 17-008-01 (APM) |
| v. : | |
| : | **FILED** |
| JAMES RATCLIFFE, : | JAN 2 6 2017 |
| : | Clerk, U.S. District & Bankruptcy |
| Defendant. : | Courts for the District of Columbia |

## STATEMENT OF OFFENSE

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, James Ratcliffe (the "Defendant"), agrees and stipulates as follows:

### Background

1.  The Defendant is a manager of the Car Collision Center, LLC (the "Collision Center") located in Springfield, VA. Prior to 2010, the Defendant was an owner of the Collision Center. The Defendant also operates as a sole proprietor under the name of Collector's Auto Restoration ("Collector's Auto"), which originally was co-located with the Collision Center, but has been located in Fredericksburg, VA since 2012. The Defendant has managed the Collision Center and Collector's Auto for approximately thirty-two years.

2.  Person A owns the Collision Center, and has worked for and managed certain aspects of the Collision Center's business throughout its existence.

3.  The Defendant and Person A have maintained a license to sell automobiles in Virginia for approximately the past twenty-five years. The license is in the name of Collector's Auto.

4. Through the Collision Center, the Defendant and others performed work on vehicles for government agencies, including the United States Department of State ("DOS"). Vehicles that came to the Collision Center from DOS for work or repairs were delivered by DOS employees who provided the Collision Center with paperwork indicating the work to be performed. The Collision Center prepared estimates for the work requested, and if approved, employees of the Collision Center prepared work tickets for such vehicles, performed the required work, and billed DOS for the cost of the work.

5. On various occasions, DOS vehicles were delivered to the parking lot of the Collision Center for destruction. The Defendant and others prepared the vehicles for destruction, and then delivered them to a salvage yard where the vehicles were crushed and sold for scrap. Such vehicles came with appropriate paperwork from DOS directed to Collector's Auto, which was necessary to have the vehicles destroyed by the salvage yard.

6. Person B is a DOS employee. At all relevant times Person B worked in the DOS Defensive Equipment and Armored Vehicle Division. Person B was responsible for the acquisition, repair, and maintenance of armored vehicles for DOS. Person B was also involved in record-keeping with respect to DOS armored vehicles.

7. Person B was one of the DOS employees who frequently brought or sent armored vehicles to the Collision Center for work or repairs on the vehicles. Most often, these vehicles were Chevrolet Suburbans. The Defendant dealt with Person B frequently regarding DOS vehicles and related matters. Person A also dealt with Person B regarding DOS vehicles and related matters. Based upon Person B's handling of vehicles and matters for DOS, the Defendant had an understanding that Person B was a manager or other figure of authority within DOS's vehicle operations.

8. In or around 2010, the Defendant changed the business location of the Collision Center and Collector's Auto. The new location was also in Springfield, VA, but unlike the original location it was not zoned to allow an automobile dealership to operate. In or around 2012, the Defendant determined to open a new location for Collector's Auto in or near Fredericksburg, VA, where he could maintain his automobile dealer's license. From that time on, the Defendant maintained two business locations, one in Springfield, VA, and one in Fredericksburg, VA. The Defendant did not generally have employees staffing the Fredericksburg location, nor was substantial work performed at that location. The Defendant maintained that location so that he could keep his automobile dealer's license.

9. From in or around 2012 to in or around 2016, Person C was the Defendant's landlord at the Fredericksburg location. The Defendant met Person C when the Defendant needed certain construction work on the building where the Collision Center is located, and the Defendant hired Person C to perform that work. Person C also owned a flatbed truck, and the Defendant sometimes engaged Person C to haul vehicles. Virginia regulations require a dealership to be open at least twenty hours per week, but the Defendant rarely spends that much time at Collector's Auto's Fredericksburg location Virginia has fined Collector's Auto on two occasions – once in April 2016 and again in July 2016 – for violating this regulation. The Defendant's rent at the Fredericksburg Location was $12,000 per year. The Defendant did not generally earn any significant income from legitimate vehicle sales or other work conducted at the Fredericksburg location.

**Criminal Conduct**

Tires and Wheels

10.     On at least two occasions between in or around 2011 and in or around 2012, Person B caused truckloads of DOS tires and wheels to be delivered to the Collision Center. Person B notified the Defendant that such loads were coming, and that the Defendant could sell them and keep the proceeds. The Defendant paid nothing to Person B or DOS to acquire these tires and wheels, and he knew they had come from DOS. The Defendant and Person A would arrange to be present when a truckload of DOS tires and wheels was coming in. The Defendant and others sold some of these tires and wheels to individuals and local businesses through off-book, backdoor transactions observed by employees at the Collision Center. Other tires and wheels were taken by Person B and Person C.   The Defendant kept the full proceeds of his sales of tires and wheels. The total amount taken by the Defendant in this manner is indeterminate, but was at least $7,500.

Misappropriated Vehicles Sold

11.     Beginning in or before June 2011, and continuing through at least November 2013, Person B and the Defendant took a Hummer and twelve Suburbans from the DOS motor pool. When this conduct first began, the Defendant and Person B did not specifically discuss what the Defendant would do with such vehicles. Person B indicated to the Defendant initially that these vehicles were surplus vehicles that were not in DOS inventory. Eventually, the Defendant understood that such vehicles were misappropriate from DOS, and the Defendant and Person B agreed that the Defendant would sell these misappropriated vehicles, and split the proceeds with Person B.

    a.     In or prior to June, 2011, Person B informed the Defendant that he could deliver a 2004 Hummer to the Defendant, along with paperwork that would allow the

4

Defendant to title, and then sell, the Hummer. The Defendant received a title for the Hummer, transferred ownership in name of Collector's Auto, and then Person A sold it to a person known to the Defendant and Person A for $8,000.

    b.      Subsequently, Person B informed the Defendant that Person B could take DOS Suburbans from the DOS motor pool, and provide the Defendant with paperwork that would allow the Defendant to obtain titles, and then sell, the Suburbans.

    c.      The Defendant and Person B agreed that the Defendant would take custody of such DOS Suburbans, and obtain titles for them for the purpose of selling them, even though the Defendant had no legitimate claim to ownership of the Suburbans.

    d.      The Defendant and Person B agreed that the Defendant would sell the DOS Suburbans. The Defendant agreed to split the proceeds with Person B by making cash payments to Person B as well as making in-kind payments of two Chevrolet Corvettes and a Dodge pickup truck to Person B. The Defendant paid Person B cash payments equivalent to between 20% and 50% of the proceeds of the sales. The amount the Defendant kicked back to Person B depended on the work the Defendant had to do to get a misappropriated DOS vehicle ready for sale. The reason the Defendant paid Person B in cash was that Person B specifically asked to be paid in cash.

    e.      On one occasion in or around November 2012, the Defendant and Person B went to a lot where new or nearly-new DOS Suburbans were stored. Person B provided the Defendant with paperwork and keys to six 2012 DOS Suburbans. In some instances, in order to find the Suburbans they intended to take, the Defendant had to click the key fobs until he saw lights flashing on the corresponding Suburban. The Defendant and

Person B took the six Suburbans from the storage lot, and moved them to the Collision Center.

  f. Thereafter, for a period of time, customers at the Collision Center occasionally examined the six misappropriated Suburbans. The Defendant looked on as customers examined the Suburbans. The six misappropriated Suburbans did not sell immediately, and the Defendant transferred them to his business location in Fredericksburg. By November 2013, the Defendant had sold all six of these Suburbans.

  g. The Defendant did not tell purchasers of the misappropriated vehicles that they were in fact DOS vehicles, because he believed the purchasers would not buy them if they knew the circumstances surrounding the Defendant's acquisition of the vehicles. If customers or other individuals asked the Defendant where the vehicles came from, the Defendant would falsely answer that he acquired the vehicles at an automobile auction.

  h. Person A participated in the sale of at least two misappropriated DOS Suburbans by signing Bills of Sale as a witness. Person C was the listed seller of one of the DOS Suburban in his role as Collector's Auto salesperson. Person C's son also purchased one of the Suburbans (separate from the one sold by Person C).

  i. The Defendant generally sold the misappropriated DOS vehicles for at or near market prices. The total sales price of these misappropriated vehicles was $408,520, the majority of which the Defendant and Person A kept and spent for their own personal benefit, and the remainder of which the Defendant paid to Person B.

12. The following chart summarizes the vehicles misappropriated and sold by the Defendant and Person B:

| Sale # | Date of Sale | Price | VIN | Year | Make | Model | Mileage |
|---|---|---|---|---|---|---|---|
| 1 | 6/4/2011 | 8,000 | XXXXXXXXXXXX3026 | 2004 | Hummer | H2 | 2175 |
| 2 | 9/7/2011 | 40,000 | XXXXXXXXXXXX6579 | 2011 | Chevrolet | SUV | 51 |
| 3 | 9/23/2011 | 37,000 | XXXXXXXXXXXX5456 | 2011 | Chevrolet | K2500 Suburban LT | Less than 100 |
| 4 | 12/12/2011 | 20,000 | XXXXXXXXXXXX5875 | 2006 | Chevrolet | K2500 Suburban LT | 135 or less |
| 5 | 3/20/2012 | 15,295 | XXXXXXXXXXXX 2639 | 2009 | Chevrolet | K1500 Suburban LS | 581 |
| 6 | 3/26/2012 | 27,000 | XXXXXXXXXXXX0567 | 2009 | Chevrolet | K1500 Suburban LS | 149 |
| 7 | 5/23/2012 | 28,225 | XXXXXXXXXXXX0241 | 2009 | Chevrolet | K2500 Suburban LT | 2591 |
| 8 | 11/27/2012 | 35,000 | XXXXXXXXXXXX4688 | 2012 | Chevrolet | K2500 Suburban LT | 253 |
| 9 | 12/12/2012 | 43,000 | XXXXXXXXXXXX1791 | 2012 | Chevrolet | K2500 Suburban LT | 50 |
| 10 | 1/10/2013 | 42,000 | XXXXXXXXXXXX5416 | 2012 | Chevrolet | K2500 Suburban LT | 3562 |
| 11 | 6/21/2013 | 38,000 | XXXXXXXXXXXX3323 | 2012 | Chevrolet | K2500 Suburban LT | 50 |
| 12 | 10/4/2013 | 38,000 | XXXXXXXXXXXX4896 | 2012 | Chevrolet | K2500 Suburban LT | 9848 |
| 13 | 11/20/2013 | 37,000 | XXXXXXXXXXXX3562 | 2012 | Chevrolet | K2500 Suburban LT | 7800 |

13.   With regard to sales 1-3, 5-6, and 8-13 on the above chart, the buyers paid the Defendant by check. On each of those occasions, the Defendant deposited the check into his bank account, causing same-day interstate wire transmissions from the Defendant's bank in Alexandria, VA, to Federal Reserve processing centers located in New Jersey and Texas.

14.   Unlike the vehicles that came to the Collision Center for legitimate work, the above vehicles came with no work requests, and the Collision Center generated no internal work tickets with regard to these vehicles.

<u>Misappropriated Vehicles Not Sold</u>

15.   In or around 2015, Person B provided the Defendant with two 2013 Suburbans taken from DOS. With regard to these two Suburbans:

7

      a.      Although Person B told the Defendant that Person B would provide paperwork for the Suburbans to facilitate the sale of the vehicles by the Defendant, Person B was not able to do so, and the Defendant was not able to obtain titles or sell them.

      b.      One of these Suburbans was white, and had a VIN ending in XXXXXXXXXXXXX7890. The other of these Suburbans was black, and had a VIN ending in XXXXXXXXXXXXX4105.

      c.      The Defendant was aware that these two Suburbans were DOS vehicles when he took possession of them. Although the Defendant was not aware of the specific details regarding the DOS acquisition of these two Suburbans, they had been diverted from a DOS order for ten armored Suburbans, and the VINs for them appear on the order/acquisition paperwork within DOS, but they were never logged into the primary DOS vehicle inventory system. When the Defendant received these Suburbans, they were essentially brand new and had never been titled or registered anywhere.

      d.      Because the Defendant could not dispose of these misappropriated Suburbans without origin or title paperwork, he kept them at his place of business and/or his home. The Defendant obscured the VIN numbers under the windshields of these Suburbans so that the numbers were not visible from the outside of the vehicles.

      e.      From the time the Defendant received these two Suburbans until March 2016, the Defendant and Person A drove and rode in the black Suburban as their personal vehicle, using the Defendant's automobile dealer's tag while doing so, and kept the white Suburban parked at their home.

      f.      During a traffic stop on March 2, 2016, a Fairfax County Police Department Detective observed the Defendant and Person A inside the misappropriated black

8

Suburban. The Detective requested that the Defendant provide the VIN number of the Suburban, and that the Defendant remove the obstruction covering the VIN number under the windshield. When confronted with the fact that the Suburban was not registered, Person A stated that the Defendant and Person A perform work for DOS, and that they had this black Suburban in connection with that work.

  g. The base price for each of these two Suburbans, which DOS paid to acquire these vehicles, was $48,200, for a total of $96,400.

16. The total value of the property the Defendant misappropriated through the above schemes was at least $512,420.

JOHN P. MARSTON
Bar No. DC - 493012
United States Attorney's Office
District of Columbia
555 4th Street, N.W., 5th Floor
Washington, D.C. 20530

**Defendant's Acceptance**

I have read this Statement of the Offense and carefully reviewed every part of it with my attorney. I am fully satisfied with the legal services provided by my attorney in connection with this Statement of the Offense and all matters relating to it. I fully understand this Statement of the Offense and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully. No agreements, promises, understandings, or representations have been made with, to, or for me other than those set forth above.

JAN 26 2017
Date

James E Ratcliffe
James Ratcliffe
Defendant

**Defense Counsel's Acknowledgment**

I am defendant James Ratcliffe's attorney. I have reviewed every part of this Statement of the Offense with my client. It accurately and completely sets forth the Statement of the Offense agreed to by the defendant, the Office of the United States Attorney for the District of Columbia, and the Antitrust Division.

January 26, 2017
Date

Allen Orenberg, Esq.